UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------- X
WADE DISMEL,

              Petitioner,              **NOT FOR PUBLICATION**

   -against-                    **MEMORANDUM AND ORDER**

LaVALLE, Superintendent of Clinton
Correctional Facility,          11-CV-85 (KAM)

              Respondent.
--------------------------------- X

**KIYO A. MATSUMOTO, United States District Judge:**

      *Pro se* petitioner Wade Dismel[1] ("petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for four counts of first-degree rape, one count of first-degree criminal sexual act, and one count of second-degree assault, for which, among other convictions,[2] he was sentenced to fifteen years imprisonment and five years of post-release supervision. (*See generally* ECF No. 1, Petition for Writ

---

[1] Although petitioner's name was spelled "Wade Dismal" in this court's January 12, 2011 Order to Show Cause, (ECF No. 2, Order to Show Cause dated 1/12/11), the court acknowledges that the correct spelling of petitioner' name is "Wade Dismel," as confirmed by the caption on the instant habeas petition, the state court trial record, the New York State Department of Correctional Services' computerized records, and the captions on his state appellate court cases. (ECF No. 1, Petition for a Writ of Habeas Corpus ("Pet.")); Inmate Information, New York State Department of Correctional Services, http://www.doccs.ny.gov (last visited 7/25/13); *People v. Dismel*, 15 N.Y.3d 749 (2010); *People v. Dismel*, 893 N.Y.S.2d 879 (2d Dep't 2010).

[2] Petitioner was also convicted of eight counts of second-degree criminal contempt and one count of second-degree unlawful imprisonment. (ECF No. 8, Affidavit of Marie-Claude P. Wrenn in Opposition to Petition for Writ of Habeas Corpus ("Wrenn Aff.") ¶ 6.) As discussed below, however, petitioner does not challenge his convictions for those offenses in the instant habeas petition. (*See generally* Pet.)

of Habeas Corpus ("Pet.").)[3]  Petitioner is currently
incarcerated pursuant to his sentence at Clinton Correctional
Facility in Dannemora, New York. (Pet. at 1, 6.)  For the
reasons set forth below, petitioner's request for a writ of
habeas corpus is denied, and the petition is dismissed.

**BACKGROUND**

The following facts and procedural history are derived
from the parties' submissions and the evidence introduced at
petitioner's jury trial in New York state court.  Because
petitioner challenges the evidentiary sufficiency of his state
criminal convictions, the court considers the trial evidence in
the light most favorable to the prosecution. *See, e.g.*,
*Ponnapula v. Spitzer*, 297 F.3d 172, 176 (2d Cir. 2002) (citing
*Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir.
2000)).

**I.   Evidence Presented at Trial**

**A.   Petitioner's Relationship with Marjorie Puyol**

Petitioner and Marjorie Puyol ("Puyol") met in June
2003 and became friends soon thereafter. (Trial Tr. at 39.)[4]  By
November 2003, their friendship had grown into a romantic
relationship. (*Id.* at 39-40.)

---

[3] Because the habeas petition is not consecutively paginated, the
court will refer to the page numbers automatically assigned by the court's
electronic case filing system.
[4] "Trial Tr." refers to the transcript from petitioner's jury
trial, as submitted in Exhibits C, D, and E to the Respondent's Opposition
papers, which are consecutively paginated. (*See* Wrenn Aff. ¶ 13.)

In April 2004, petitioner began to live with Puyol. (*Id.* at 40.)  Puyol testified that she let petitioner move into her apartment at that time "because he [had] lost his apartment and he was kind to [her] when [she] wasn't working." (*Id.*)  Puyol explained that petitioner would bring her food and would provide moral support by spending time with her while she was unemployed. (*Id.* at 41.)  Puyol intended the shared living arrangement with petitioner to be temporary and informed petitioner that he could stay in her apartment until he could "get [his] own place." (*Id.* at 42.)

Under this shared living arrangement, petitioner typically stayed in Puyol's apartment two to three times a week and spent the other nights working for a club. (*Id.* at 42-43.)  Despite his employment, petitioner did not contribute any money towards Puyol's rent, which eventually became a source of friction in their relationship. (*Id.* at 43.)  According to Puyol, petitioner "was spending his money" and "would never come [home] with cash." (*Id.*)  As a result, Puyol would give petitioner money "to supplement his income." (*Id.*)  Although petitioner occasionally gave money to Puyol, Puyol testified that she "was always giving more than [petitioner] gave to [her]." (*Id.*)

Puyol further testified that, despite her religious beliefs against pre-marital sex, she "gave in to [the petitioner]" by having sex with him during the beginning of

their relationship. (*Id.* at 44.)  This sexual relationship ended around late 2004 or early 2005 because of Puyol's religious beliefs. (*Id.* at 43-44.)  Although Puyol's decision to end the sexual relationship initially upset petitioner, he eventually "just went along with it." (*Id.* at 46.)  Despite the end of their sexual relationship, petitioner and Puyol's sleeping arrangements did not change, and the two continued to sleep together in the same bed. (*Id.*)  At trial, Puyol explained that her only interactions with petitioner during this period were in passing because petitioner was working while she was sleeping and vice versa. (*Id.* at 46-47.)

On December 12, 2005, petitioner attempted to enter Puyol's apartment after having been "gone for about three weeks." (*Id.* at 48.)  Puyol testified that she locked petitioner out of the apartment and that, in response, petitioner "was outside making a bit of a ruckus." (*Id.*)  Puyol then called the police, who came to the apartment and explained to Puyol that she could not lock petitioner out of the apartment because he had been living there for more than thirty days. (*Id.* at 48-49.)  The police subsequently advised Puyol that she needed an eviction notice from Landlord Tenant Court in order to permanently remove petitioner from her apartment. (*Id.* at 49.)  Despite this advice, Puyol did not immediately go to Landlord Tenant Court to obtain

the necessary eviction paperwork because she feared conflict with petitioner. (*Id.* at 49-51.)

After the December 2005 incident, petitioner and Puyol continued to live together in the apartment, but their sleeping arrangements changed. (*Id.* at 50-51.)  Specifically, Puyol testified that she slept on the living room sofa while petitioner slept in the bed. (*Id.* at 51.)  Puyol described her relationship with petitioner during this time as "estranged" and testified that she "stayed away from [petitioner] as much as [she] could, not holding too much conversation with him." (*Id.* at 55-56.)

In or around May 2006, Puyol and petitioner had another argument, which ultimately became physical. (*Id.* at 52-53.)  According to Puyol, petitioner put his hands in her face, and the two of them "got into a tussle." (*Id.* at 53.)  Because of this altercation, Puyol decided to go to Landlord Tenant Court to secure an eviction notice. (*Id.* at 52-53.)  At Landlord Tenant Court, Puyol learned how to fill out the eviction notice forms but did not file the forms because she had insufficient funds to cover the filing fee. (*Id.* at 53-54.)  Puyol therefore saved the forms in her closet until she could pay the filing fee but ultimately never served petitioner with an eviction notice. (*Id.* at 54.)

**B.  The June 25, 2006 Incident**

Approximately one month later, the tension between Puyol and petitioner intensified.  According to Puyol's trial testimony, petitioner confronted Puyol in the elevator of her building on the evening of June 24, 2006. (*Id.* at 54-55.) Petitioner began to question Puyol, asking her where she had been, but Puyol refused to argue in the elevator. (*Id.* at 55.) Petitioner and Puyol entered the apartment, where Puyol sat on the sofa and fell asleep. (*Id.*)

Puyol testified that she awoke around 1:30 a.m. on the morning of June 25th and found petitioner in her home office holding the eviction forms from Landlord Tenant Court. (*Id.* at 56-57.)  Puyol asked petitioner why he was going through her belongings and asked him to give her the eviction paperwork. (*Id.* at 57.)  Petitioner walked out of the office towards the living room, and Puyol followed, asking petitioner for her paperwork. (*Id.*)  According to Puyol, petitioner, upset about the eviction paperwork, grabbed her by the neck, threw her down onto the sofa, and then proceeded to choke her. (*Id.*)  Puyol could not breathe and twisted her body to get away from petitioner. (*Id.*) Petitioner commanded Puyol to get on the floor, but Puyol refused. (*Id.*)  Petitioner eventually wrapped his arm around Puyol and threw her to the ground. (*Id.*)  Petitioner then proceeded to beat Puyol, kicking and punching her head and back.

6

(*Id.* at 57-58.) As a result of petitioner's attack, Puyol suffered from several broken teeth. (*See id.* at 63-64.)

Puyol testified that she stood up in shock after petitioner stopped beating her. (*Id.* at 58.) Petitioner thereafter chained the apartment door and told Puyol that she would have to use a bucket to relieve herself. (*Id.*) Petitioner then took a bucket from the kitchen, placed the bucket next to the sofa, and told Puyol that she was "going no where." (*Id.*) After telling Puyol that she would not be "getting out of [the apartment] by Tuesday, if [she] live[s] that long," petitioner left the living room and walked to the back of the apartment. (*Id.* at 59.) While petitioner was in the back of the apartment, Puyol unsuccessfully attempted to break the double-paned window in the living room so that someone might hear her. (*Id.*) Petitioner returned to the living room and tried to take off Puyol's dress. (*Id.*) Puyol attempted to stall petitioner by telling him that she needed her glasses and that she could not see without them. (*Id.*) After petitioner and Puyol were unable to find the glasses, petitioner told Puyol, "[i]f you are not going to give it to me, I'll take it." (*Id.*) According to Puyol, petitioner then began drinking scotch, snorting cocaine, and watching rap videos while Puyol sat on the floor. (*Id.* at 60.) Petitioner then proceeded to have sexual intercourse with Puyol. (*Id.*) Puyol testified that petitioner pulled on her dress and

that she therefore took the dress off so as not to further agitate petitioner. (*Id.*)  Petitioner attempted anal intercourse with Puyol twice, but stopped as she screamed in pain. (*Id.*)  In addition, petitioner forced Puyol to wear certain pantyhose and to perform other sexual acts. (*Id.* at 60-61.)

According to Puyol, petitioner ultimately allowed her to use the bathroom, instead of the bucket, and subsequently forced her to perform oral sex. (*Id.* 63.)  Petitioner then directed Puyol to the bedroom, where he forced her to have vaginal intercourse with him. (*Id.* at 64.)  Petitioner then fell asleep in the bed. (*Id.* at 64-65.)  While petitioner was asleep, Puyol slowly moved away from him, dressed herself, and called her neighbor, Mary McClain. (*Id.* at 65, 250.)  Puyol instructed McClain to call the police and then used the phone cord to tie the bedroom door shut. (*Id.* at 65, 249-51.)  Afterwards, Puyol went to McClain's apartment and called the police. (*Id.* at 65-66.)

Police Officer Keith Chatterton and his partner, Officer Nussenblatt,[5] arrived on the scene at approximately 10:50 a.m. on June 25, 2006. (*Id.* at 196-97.)  According to Officer Chatterton's testimony at trial, Puyol was "scared, shaken, and very quiet" and that "[h]er right eye was swollen shut" when he

---

[5] Neither the trial record nor the parties' submissions provide Officer Nussenblatt's first name.

arrived to her apartment. (*Id.* at 197.)  During a brief
interview, Puyol informed Officer Chatterton that "her boyfriend
hit her" but did not mention the sexual assault. (*Id.* at 197,
209.)  After the interview, Officer Chatterton entered Puyol's
apartment and noticed a white bucket in the living room but did
not gather any physical evidence including the bucket, pantyhose,
or any bottles of liquor. (*Id.* at 198, 205-06.)

    Officer Chatterton testified that he found petitioner
naked and asleep in Puyol's bedroom and noted a strong smell of
alcohol in the room. (*Id.* at 199-200.)  Officer Chatterton then
"woke [petitioner] up, instructed him to get dressed, and then
placed him under arrest." (*Id.* at 201.)  According to Officer
Chatterton's testimony, petitioner did not need assistance
putting clothes on and was cooperative during the arrest. (*Id.*
at 206-07.)

    After petitioner's arrest, Officer Chatterton took
petitioner to the 79th Precinct and handed over Puyol's case to
Officer Michael Pinkney, who processed petitioner's arrest and
interviewed Puyol. (*Id.* at 201-02, 211-13.)  Officer Pinkney
testified that he was busy on the day that he interviewed Puyol.
(*See id.* at 217-18.)  Officer Pinkney also testified that,
during this interview, Puyol "mentioned that she was sexually
assaulted" but that he did not delve into details of the sexual
assault because he was busy as the only domestic violence

officer on duty that day and was also "traumatized" by Puyol,
who reminded him of his own mother. (*Id.* at 222, 234-35.)

      At Officer Pinkney's instruction, Puyol completed part
of a Domestic Incident Report, in which she described what
happened during the June 25th incident. (*See id.* at 213.)  The
Domestic Incident Report also required Officer Pinkney to
provide certain information regarding the suspect's alleged
conduct. (*See id.* at 213, 227-30.)  On cross-examination at
trial, Office Pinkney admitted that, when he completed the
Domestic Incident Report, he only marked down the "punching"
category to describe petitioner's actions and did not mention
sexual assault in the Domestic Incident Report. (*Id.* at 229-30.)
In addition, Officer Pinkney filled out an On-Line Booking
System Arrest Work Sheet. (*Id.* at 230.)  On that arrest
worksheet, Officer Pinkney listed only one charge, third-degree
assault (a misdemeanor), and did not list any sexual assault
charges. (*Id.* at 231-32.)  The information contained in the
arrest worksheet populated an Omniform Arrest Report, which
similarly listed only third-degree misdemeanor assault without
reference to any sexual offense or felony. (*See id.* at 232.)

      After completing the Domestic Incident Report, Puyol
was taken to Woodhull Hospital by ambulance. (*Id.* at 68, 219.)
Puyol testified that she told an emergency room doctor at
Woodhull Hospital that she "had gotten beat up and . . . was

10

sexually assaulted." (*Id.* at 68.)   The emergency room staff thereafter treated Puyol's head and eye injuries and administered a CAT scan. (*Id.*)   Puyol further testified that a male social worker interviewed her during her stay at Woodhull Hospital. (*Id.* at 68-69.)   During that interview, Puyol informed the social worker that petitioner sexually assaulted her. (*Id.* at 69.)   Puyol was subsequently discharged from the hospital without being treated for rape. (*Id.* at 70.)

After her discharge from the hospital on June 25th, Puyol returned home and called her friend Nicole Mason. (*Id.* at 55, 70-71.)   Following her telephone conversation with Mason, Puyol returned to Woodhull Hospital. (*Id.* at 71.)   There, Puyol asked for a rape kit and was examined by Physician Assistant Dustaff Persaud ("PA Persaud"), a member of the Sexual Assault Response Team.[6] (*Id.* at 71-72, 162-63, 167.)   PA Persaud testified that when he examined Puyol, she was upset and depressed and had a bloodshot right eye, a swollen face, and injuries to her ear, neck, and back. (*Id.* at 168-69, 181.)   In addition, PA Persaud used a rape kit to collect DNA evidence from Puyol's body. (*Id.* at 169-70.)   PA Persaud sealed the rape kit and passed it along to the New York Police Department, who

---

[6] The Sexual Assault Response Team is a team of emergency room practitioners who respond to and examine victims of reported incidents of sexual assault. (Trial Tr. at 163-67.)

subsequently turned it over to the Medical Examiner's office for DNA testing. (*Id.* at 170-71.)

PA Persaud further testified that his internal examination of Puyol revealed no visual injuries to the vaginal or rectal areas. (*Id.* at 171.)  According to PA Persaud's expert testimony, the lack of visual injuries to the vaginal or rectal areas was not inconsistent with a sexual assault because "[n]ot all sexual assault cases . . . will result in injuries" to those areas, particularly with women of Puyol's age. (*Id.*)  Following his internal examination, PA Persuad gave Puyol medication to prevent sexually transmitted diseases. (*Id.* at 172.)

On cross-examination, PA Persaud acknowledged that several of Puyol's medical forms, including interview notes from the hospital social worker, triage nurse, and doctor, did not mention any sexual assault or rape. (*Id.* at 184-88.)  PA Persaud testified, however, that some medical staff tend to disbelieve victims who report rape when the victim has been in an intimate relationship with the alleged perpetrator. (*Id.* at 188.)

In March 2007, several months after the alleged sexual assault, Officer Pinkney took swab samples from petitioner's mouth and took them to the Medical Examiner's Office. (*Id.* at 216-17.)  After receiving petitioner's swab samples, Medical Examiner Rawlston Crowther (the "Medical Examiner") conducted testing to compare petitioner's DNA with the samples collected

from Puyol's rape kit. (*See id.* at 272-90.)  At trial, the
Medical Examiner testified that the DNA samples taken from
Puyol's rape kit matched petitioner's DNA profile. (*See id.* at
279-80, 283.)

        While in pre-trial custody, petitioner left Puyol
several voice messages in June 2006 and again on May 13, 2007.
(*Id.* at 75, 82.)  In addition, between 2006 and 2007, petitioner
wrote several letters to Puyol despite his awareness that Orders
of Protection prohibited him from contacting her. (*See id.* at 76,
101-16; Pet. at 20; Wrenn Aff., Exh. G, Trial Stipulations dated
7/23/07 ("Trial Stip.").)  In these letters and voicemails,
petitioner apologized to Puyol for causing her pain and
expressed his love for her. (*See* Trial Tr. at 76, 101-16; Pet.
at 20.)

## II.  **Procedural History**

### A.  **Petitioner's Indictment**

        Petitioner was charged by Kings County Indictment
Number 5568/07[7] with four counts of first-degree rape (N.Y. Penal
Law § 130.35(1)), six counts of first-degree sexual abuse (N.Y.
Penal Law § 130.65(1)), one count of third-degree aggravated
sexual abuse (N.Y. Penal Law § 130.66(1)(a)), two counts of
first-degree criminal sexual act (N.Y. Penal Law § 130.50(1)),

---

[7] Kings County Indictment Number 5568/07 superseded Kings County
Indictment Number 5107/06. (*See* Wrenn Aff. ¶ 5 n.2.)

one count of second-degree felony assault (N.Y. Penal Law

§ 120.05(6)), one count of third-degree assault (N.Y. Penal Law

§ 120.00(1)), nine counts of second-degree criminal contempt

(N.Y. Penal Law § 215.50(3)), and one count of second-degree

unlawful imprisonment (N.Y. Penal Law § 135.05). (Wrenn Aff. ¶

5.)

**B.    Petitioner's Jury Trial**

Following a week-long trial in Kings County Supreme

Court, the jury found petitioner guilty of four counts of first-

degree rape, one count of first-degree criminal sexual act (anal

sexual conduct), one count of second-degree assault, eight

counts of second-degree criminal contempt,[8] and one count of

second-degree unlawful imprisonment. (Wrenn Aff. ¶ 6; Trial Tr.

at 412-17.)  The jury acquitted petitioner of third-degree

aggravated sexual abuse and one count of first-degree criminal

sexual act (oral sexual conduct).[9] (*See* Wrenn Aff. ¶ 6; Trial Tr.

at 414.)

**C.    Petitioner's Direct Appeal**

In June 2009, petitioner appealed his first-degree

rape, first-degree sexual assault, and second-degree felony

assault convictions on the grounds that the prosecution failed

_____

[8] One count of second-degree criminal contempt was dismissed prior
to trial because the order of protection was not properly served. (Wrenn Aff.
¶ 6.)
[9] The jury was not instructed on first-degree sexual abuse because
the prosecution dismissed those counts at trial. (*See* Trial Tr. at 375-402,
412.)

to prove his guilt for those crimes beyond a reasonable doubt
and that the jury's verdict was against the weight of the
evidence. (*See* Wrenn Aff., Ex. H, Petitioner's Appellate
Division Brief ("App. Br.") at 16, 26.)  On February 16, 2010,
the Appellate Division affirmed petitioner's convictions. *People
v. Dismel*, 893 N.Y.S.2d 879 (2d Dep't 2010).  Specifically, the
Appellate Division determined that there "was legally sufficient
[evidence] to establish [petitioner's] guilt of rape in the
first degree, criminal sexual act in the first degree, and
assault in the second degree beyond a reasonable doubt." *Id.* at
879 (citations omitted).  The Appellate Division further
explained that, although "fulfilling [its] responsibility to
conduct an independent review of the weight of the evidence,
[it] nevertheless accord[ed] great deference to the factfinder's
opportunity to view the witnesses, hear the testimony, and
observe demeanor." *Id.* (citation omitted).  As such, the
Appellate Division was "satisfied that the verdict . . . was not
against the weight of the evidence." *Id.* at 880.  On June 9,
2010, the New York Court of Appeals denied petitioner leave to
appeal the Appellate Division's decision. *See People v. Dismel*,
15 N.Y.3d 749 (2010).  Petitioner did not file a petition for a
writ of *certiorari* in the United States Supreme Court. (*See* Pet.
at 2.)

15

D.    **The Instant Habeas Petition**

On December 28, 2012, petitioner filed the instant petition for a writ of habeas corpus, in which he challenges the evidentiary sufficiency of his convictions for first-degree rape, second-degree felony assault,[10] and first-degree criminal sexual act.[11] (*See* Pet. at 8, 30.)  Respondent submitted its Opposition on April 28, 2011, and petitioner filed a Reply on May 18, 2011. (*See* ECF No. 8, Respondent's Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus ("Resp't Opp."); ECF No. 9, Petitioner's Traverse/Reply to Respondent's Opposition dated 5/18/11 ("Pet'r Reply").)

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal

---

[10] Petitioner does not dispute that he assaulted Puyol and in fact admits his "guilt with respect to the physical confrontation," during which "he had struck [Puyol], causing physical injury." (Pet. at 30; *see also* Pet'r Reply at 12.)  Nevertheless, petitioner maintains that the physical assault was not in furtherance of any sexual assault or criminal sexual act and therefore claims that the second-degree felony assault conviction pursuant to N.Y. Penal Law § 120.05(6) should be reduced to third-degree assault, a misdemeanor offense. (*See* Pet. at 30; App. Br. at 26.)

[11] Petitioner does not appear to contest the evidentiary sufficiency of his convictions for second-degree criminal contempt and second-degree unlawful imprisonment in the instant habeas petition. (*See generally* Pet.)  Nor could he properly do so at this juncture.  Because petitioner failed to challenge his criminal contempt and unlawful imprisonment convictions on direct appeal or on collateral review without any demonstrated cause or prejudice, any habeas claims challenging those convictions would either be unexhausted or procedurally defaulted, thereby precluding habeas review. *See, e.g., Jones v. Keane*, 329 F.3d 290, 294-96 (2d Cir. 2003).  In any event, the court finds that the trial evidence was legally sufficient to support petitioner's convictions for second-degree criminal contempt and second-degree unlawful imprisonment. (Trial Tr. at 58-59, 75-76, 101-16; Trial Stip.); *see also People v. Levi*, 55 A.D.3d 625, 626 (2d Dep't 2008); *People v. Lotmore*, 276 A.D.2d 901, 901-02 (3d Dep't 2000).

courts must apply in reviewing state court decisions on habeas petitions.  Under AEDPA, a federal court may grant habeas relief with respect to a claim adjudicated on the merits in state court only if the adjudication of the claim resulted in a decision that was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).  Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the habeas petitioner has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In reviewing the petition, the court is mindful that a "document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted); *see also Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983) ("[D]ue to the *pro se* petitioner's general lack of expertise, courts should review habeas petitions with a lenient eye . . . ."). Accordingly, the court must interpret petitioner's pleadings as raising the

strongest arguments they suggest. *See Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006).

## DISCUSSION

Petitioner argues that his constitutional due process rights were violated because the trial evidence was legally insufficient to establish his guilt of first-degree rape, first-degree criminal sexual act, and second-degree felony assault beyond a reasonable doubt. (*See* Pet. at 2, 22-31). Specifically, petitioner claims that the prosecution's case was "fraught with numerous inconsistencies" and that the trial record "reveals . . . significant discrepancies, each of which collectively demonstrates that Marjorie Puyol manufactured . . . allegations against petitioner in her attempt to extricate [petitioner] from her apartment." (*Id.* at 23-24, 30; *see also* Pet'r Reply at 4-12.)

"It is fundamental that a criminal conviction offends the Due Process Clause of the Fourteenth Amendment unless it is based 'upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" *Ramos v. Smith*, No. 12-CV-4653, 2013 WL 1821104, at *3 (E.D.N.Y. Apr. 30, 2013) (alteration in original) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Nevertheless, a "petitioner 'bears a very heavy burden' when challenging the legal sufficiency of the evidence in a state criminal

conviction." *Archer v. Fischer*, No. 05-CV-4990, 2009 WL 1011591, at *8 (E.D.N.Y. Apr. 13, 2009) (quoting *Einaugler v. Supreme Court of the State of N.Y.,* 109 F.3d 836, 840 (2d Cir. 1997)), *aff'd sub nom. Mannix v. Phillips*, 619 F.3d 187 (2d Cir. 2010). Thus, a "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vassell v. McGinnis,* No. 04-CV-856, 2004 WL 3088666, at *5 (E.D.N.Y. Dec. 22, 2004) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)); *see also Ponnapula*, 297 F.3d at 179.  Indeed, "[e]ven when 'faced with a record of historical facts that supports conflicting inferences, [the court] must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Archer*, 2009 WL 1011591, at *8 (quoting *Wheel v. Robinson,* 34 F.3d 60, 66 (2d Cir. 1994)).  Stated differently, the court "must defer to the jury's 'assessments of the weight of the evidence and the credibility of witnesses.'" *Leveille v. Ercole*, No. 05-CV-5602, 2006 WL 3257233, at *4 (E.D.N.Y. Nov. 9, 2006) (quoting *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)).

In reviewing habeas claims predicated on the legal insufficiency of the trial evidence, the court "'must look to

state law to determine the elements of [each] crime.'" *Archer*,
2009 WL 1011591, at *8 (quoting *Quartararo v. Hanslmaier*, 186
F.3d 91, 97 (2d Cir. 1999)).  Having reviewed the underlying
state court record and the relevant provisions of New York Penal
Law as set forth below, the court finds that the trial evidence,
viewed in the light most favorable to the prosecution, amply
supported the jury's conclusion that petitioner was guilty of
first-degree rape, first-degree criminal sexual act, and second-
degree felony assault beyond a reasonable doubt.

## I.     **First-Degree Rape**

          Under New York law, a person is guilty of first-degree
rape when he (1) engages in "sexual intercourse" with another
person (2) by "forcible compulsion." N.Y. Penal Law § 130.35(1).
Sexual intercourse is defined as having "its ordinary meaning
and occurs upon any penetration, however slight." N.Y. Penal Law.
§ 130.00(1).  Forcible compulsion, in turn, means "to compel by
either: (a) physical force; or (b) a threat, express or implied,
which places a person in fear of immediate death or physical
injury to . . . herself or another person." New York Penal Law
§ 130.00(8)(a)-(b).  "The proper focus of inquiry on forcible
compulsion is on the state of mind produced in the victim by the
defendant's conduct." *Stewart v. Hanslmaier*, No. 95-CV-790, 1996
WL 449285, at *5 (E.D.N.Y. July 29, 1996) (citing *People v.
Thompson,* 534 N.Y.S.2d 132, 134 (1988)).  Thus, "[t]hreats or

actions amounting to forcible compulsion depend on what the victim, observing the defendant's conduct, feared might happen if the victim did not acquiesce." *Id.*

The trial record in this case contains sufficient evidence to support petitioner's conviction for first-degree rape. First, Puyol's trial testimony alone adequately establishes that petitioner engaged in sexual intercourse with Puyol by forcible compulsion. *Moreno v. Kelly*, No. 95-CV-1546, 1997 WL 109526, at *4 (S.D.N.Y. Mar. 11, 1997) ("In New York, the victim's testimony alone is sufficient to establish the crime of rape in the first degree beyond a reasonable doubt."); *Hogan v. West,* 448 F. Supp. 2d 496, 513-14 (W.D.N.Y. 2006) ("[T]he testimony of a single uncorroborated witness is sufficient to establish a defendant's guilt beyond a reasonable doubt, even if that witness's testimony is not entirely consistent." (citations omitted)).

Puyol testified that, on June 25, 2006, petitioner penetrated her vagina with his penis four times, (Trial Tr. at 60-64), establishing the "sexual intercourse" element. Moreover, with respect to the "forcible compulsion" element, Puyol testified that after petitioner kicked and punched her head and back, choked her, threatened her with the words "[i]f you are not going to give it to me, I'll take it," and told her that she would not be allowed to leave the apartment "if [she] live[d]

that long," petitioner then forced her to wear certain pantyhose, coerced her into performing sexual acts, pulled her dress, and forced her to engage in vaginal intercourse. (*See id.* at 57-61, 64-65.) In addition, Puyol testified that she believed the only way to survive petitioner's violent acts was to "let him do whatever it is he is going to do, beat me." (*Id.* at 59.)

Second, although "[t]here is no requirement that a claim of rape be corroborated by medical evidence" or "corroborated at all," *Moreno*, 1997 WL 109526, at *4, the medical evidence adduced at trial and Officer Chatterton's testimony corroborate Puyol's trial testimony regarding the alleged rape, (*see* Trial Tr. at 197, 277-90). According to the Medical Examiner's expert testimony and his case file, semen cells recovered from Puyol's rape kit matched petitioner's DNA, supporting Puyol's account of the sexual assault. (*Id.* at 273-90.) Moreover, according to Officer Chatterton's testimony, Puyol, whose "right eye was swollen shut," appeared "scared, shaken, and very quiet" when the police arrived. (*Id.* at 197.)

Accordingly, the trial testimony and physical DNA evidence provided a sufficient evidentiary basis upon which a reasonable trier of fact could convict petitioner of first-degree rape.

## II.  **First-Degree Criminal Sexual Act**

In New York, a person is guilty of first-degree criminal sexual act when he engages in (1) "oral sexual conduct"[12] or "anal sexual conduct" with another person (2) by forcible compulsion. N.Y. Penal Law § 130.50(1).  Anal sexual conduct means "conduct between persons consisting of contact between the penis and anus." N.Y. Penal Law § 130.00(2)(b).

Here, the trial evidence was legally sufficient to sustain petitioner's conviction for first-degree criminal sexual act.  In particular, Puyol's testimony and corroborating DNA evidence supported the jury's determination that petitioner engaged in anal sexual conduct by forcible compulsion.  Puyol testified that petitioner attempted to forcibly penetrate her anus with his penis on two occasions but stopped because she screamed in pain, thereby establishing both elements of the criminal offense. (*See* Trial Tr. at 60.)  In addition, as previously discussed, Puyol testified that petitioner threatened her, physically assaulted her by choking, punching, and kicking her, pulled her dress, and forced her to perform other sexual acts — thus providing further evidentiary support for a finding of forcible compulsion. (*See id.* at 57-61, 64-65.)  Moreover, as

---

[12] As previously noted, petitioner was acquitted of first-degree criminal act based on alleged oral sexual conduct. (Wrenn Aff. ¶ 6; Trial Tr. at 414.)  Accordingly, for purposes of the instant petition, the court need not determine whether the trial evidence sufficiently established that petitioner engaged in oral sexual conduct by forcible compulsion.

with petitioner's first-degree rape conviction, the physical DNA evidence corroborated Puyol's testimony regarding the alleged anal sexual conduct.  According to the Medical Examiner, the semen cells recovered from Puyol's anal swab were consistent with petitioner's DNA. (*Id*. at 278-90.)  Thus, the trial evidence adequately supported the jury's determination that petitioner used forcible compulsion to engage in anal sexual conduct with Puyol.

**III.   Second-Degree Felony Assault**

To be convicted for second-degree felony assault, New York law "requires that, in the course of and in furtherance of the commission or attempted commission of a felony, the defendant . . . causes physical injury to a person other than one of the participants" of the felony. *Fonseca v. Costello*, No. 97-CV-4053, 2000 WL 1919907, at *6 (E.D.N.Y. Dec. 20, 2000) (citing N.Y. Penal Law § 120.05(6)); *see also Donovan v. Levine*, No. 01-CV-803, 2003 WL 21845744, at *6 (E.D.N.Y. Aug. 1, 2003) (citing same).  "'Physical injury' is defined as impairment of physical condition or substantial pain." *Fonseca*, 2000 WL 1919907, at *6 (citing N.Y. Penal Law § 10.00(9)).

Here, ample trial evidence supported the jury's finding that petitioner committed second-degree felony assault. As a preliminary matter, it is undisputed that petitioner caused physical injury to Puyol: petitioner concedes in his habeas

petition that "he struck [Puyol], causing physical injury." (Pet. at 30; *see also* Pet'r Reply at 12 ("[P]etitioner concedes to physically assaulting Puyol . . . .").)  Apart from petitioner's admission, the testimony and medical evidence adduced at trial established that Puyol suffered from physical injuries including a swollen right eye, bruises on her arms, legs, and thighs, and injuries to her neck, mouth, teeth, ear, head, and back as a result of petitioner's beating. (*Id.* at 63-64, 68, 168-69, 197, 251.)  Puyol also testified that she suffered from headaches for sixty days after her rape, requiring her to take Ibuprofen to relieve the severe pain. (*Id.* at 74.)

Furthermore, the trial evidence also confirmed that petitioner caused the above-mentioned physical injuries to Puyol in the course of and in furtherance of committing first-degree rape and first-degree criminal sexual act, both felonies under New York law. *See* N.Y. Penal Law §§ 130.35(1), 130.50(1). Indeed, the same violent acts causing physical injuries to Puyol also formed the basis of petitioner's forcible compulsion in raping Puyol and subjecting her to nonconsensual anal sex. (*See, e.g.*, Trial Tr. at 59-60, 63-64.)  As respondent accurately notes, petitioner's "assaultive violent acts facilitated his sexual aggression, and . . . the violence was part and parcel of furthering [petitioner's] purpose of sexually abusing" Puyol. (Resp't Opp. at 13.)  In light of the foregoing evidence, a

reasonable jury could, and did, find that petitioner was guilty
of second-degree felony assault beyond a reasonable doubt.

## IV.  <u>Witness Credibility and Evidentiary Discrepancies</u>

In a misguided effort to challenge the sufficiency of
the evidence underlying his convictions, petitioner attacks the
credibility of certain trial witnesses and argues that purported
discrepancies in the trial evidence demonstrate his innocence.
(Pet. at 23-27, 30; Pet'r Reply at 4-12.)  Petitioner's
arguments do not alter this court's conclusion that the trial
evidence was legally sufficient to support petitioner's
convictions of first-degree rape, first-degree criminal sexual
act, and second-degree felony assault beyond a reasonable doubt.

At the outset, the court notes that petitioner's
arguments are nothing more than belated requests for this court
to reassess witness credibility and to reweigh the trial
evidence.  The court, as it must, declines petitioner's
invitation to do so.  Indeed, it is axiomatic that "a *habeas*
court may neither 'disturb the jury's findings with respect to
the witness' credibility,' nor 'make credibility judgments about
the testimony presented at petitioner's trial or . . . weigh
conflicting testimony.'" *Archer*, 2009 WL 1011591, at *9
(citations omitted); *see also Marshall v. Longerer*, 459 U.S. 422,
434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no
license to redetermine credibility of witnesses whose demeanor

has been observed by the state trial court, but not by them."); *United States v. Ware,* 577 F.3d 442, 447 (2d Cir. 2009) ("'The assessment of witness credibility lies solely within the province of the jury, and the jury is free to believe part and disbelieve part of any witness's testimony . . . .'")).  The court therefore rejects petitioner's attempts to attack the credibility of trial witnesses and to contest the jury's assessment of the trial evidence by citing purported discrepancies in the trial record. *Yampierre v. Phillips*, No. 05-CV-2249, 2010 WL 744526, at *12 (E.D.N.Y. Mar. 1, 2010) ("This Court is in no position to back-seat drive the jury's determination that [the witness] told the truth.").

In any event, the putative discrepancies and inconsistencies identified by petitioner fail to demonstrate his innocence and do not entitle him to habeas relief.  Notably, the majority of these purported "discrepancies" concern either Puyol's failure to immediately report the sexual assault to law enforcement personnel or the omission of the sexual assault in various police reports and medical forms. (*See, e.g.*, Pet. at 24-27; Pet'r Reply at 4-7.)  First, Puyol's delay in reporting her sexual assault is consistent with the trial record.  For example, consistent with her delayed reporting, Puyol testified that she was "upset" and "very confused" after being traumatically beaten and raped by petitioner and that her

recollection of petitioner's violence therefore "came in spurts."
(Trial Tr. at 149.)  Equally consistent with Puyol's delayed
reporting was Officer Chatterton's trial testimony that Puyol
was "scared, shaken and very quiet" when he first responded to
the crime scene. (*Id.* at 197.)  In addition, the absence of any
reference to rape or sexual assault in certain police reports
and medical records does not necessitate a finding that the
trial evidence was insufficient as a matter of law.  Indeed, the
testimony at trial provided an explanation for these omissions.
Specifically, with respect to the lack of any reference to
sexual assault in the arrest reports, Officer Pinkney testified
at trial that although Puyol told him about the sexual assault,
he was busy on the day of Puyol's interview and was "traumatized"
because Puyol reminded him of his mother. (*Id.* at 222, 234-35.)
Moreover, addressing the omission of references to sexual
assault in Puyol's various medical forms, PA Persaud testified
that some medical staff tend to disbelieve victims who report
rape when the victim has been in an intimate relationship with
the alleged perpetrator. (*Id.* at 188.)  Accordingly, the trial
record is not irreconcilable with Puyol's delayed reporting of
her rape or the omission of that rape in police reports and
medical forms, neither of which establishes the insufficiency of
the trial evidence.

Petitioner next isolates "discrepancies" related to Officer Chatterton's failure to locate evidence at the crime scene. (Pet. at 26.)  To that end, petitioner contends that "[n]o knife or broken off blade was recovered from the apartment by Officer Chatteron, . . . or pantyhose on the living room floor," that there was "no mention of seeing cocaine," and that "although Puyol claimed to have urinated 3 or 4 times in petitioner's face in the living room, Officer Chatterton did not mention smelling such an odor when inside the apartment." (*Id.*) The absence of such evidence, however, does not disturb the jury's determination, based on the considerable trial testimony and physical DNA evidence, that petitioner committed first-degree rape, first-degree criminal sexual act, and second-degree sexual assault.[13]

Finally, petitioner argues that Puyol "admitted that petitioner was no longer welcome at her apartment, but that she could not extricate [him] absent the institution of an expensive eviction proceeding of which she did not have sufficient funding." (*Id.* at 27, 30; *see also* Pet'r Reply at 4, 7.)  Far from a discrepancy or inconsistency in the evidence, petitioner's assertion amounts to little more than a recapitulation of petitioner's defense theory, which was

---

[13] Notably, in light of Officer Chatterton's inability to locate a knife or broken blade at the crime scene, the jury acquitted petitioner of third-degree aggravated sexual abuse based on the alleged act of inserting a knife into Puyol's vagina. (*See* Trial Tr. at 414, 416.)

advanced, and ultimately rejected, at trial: namely, that Puyol manufactured her rape allegations in an attempt to evict petitioner from her apartment without having to resort to costly proceedings in Landlord Tenant Court. The court rejects petitioner's meritless attempt to recast his defense theory as an evidentiary discrepancy in order to obtain habeas relief based on the insufficiency of the evidence.[14]

In sum, the purported discrepancies enumerated by petitioner are neither irreconcilable with the trial record nor fatal to the evidentiary sufficiency of his convictions.

Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found petitioner guilty of first-degree rape, first-degree criminal sexual act, and second-degree felony assault beyond a reasonable doubt. Petitioner has therefore failed to discharge the "very heavy burden" of establishing that the trial evidence was legally insufficient to establish his guilt. *Archer*, 2009 WL 1011591, at *8 (internal quotation marks omitted). Accordingly, applying the deferential standard propounded by AEDPA as discussed above, the court finds that the Appellate Division's conclusion that the evidence was legally sufficient to establish petitioner's

---

[14] Like the purported discrepancies considered and rejected above, the remaining discrepancies raised in the petition are frivolous and do not demonstrate the legal insufficiency of the trial evidence. Indeed, such discrepancies fail to establish that, viewing the trial evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324.

guilt of first-degree rape, first-degree criminal sexual act, and second-degree assault beyond a reasonable doubt was not contrary to, or an unreasonable application of, clearly established federal law.  Nor was the Appellate Division's decision based on an unreasonable determination of the facts in light of the evidence presented at petitioner's trial. Petitioner is therefore not entitled to habeas relief.

## CONCLUSION

For the foregoing reasons, the petition is denied. Because petitioner has failed to make a substantial showing of a denial of any constitutional right, the court will not issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).  The Clerk of the Court is respectfully requested to enter judgment in favor of respondent and to close this case.  The Clerk of the Court is further directed to serve a copy of this Memorandum and Order, a copy of the judgment, and an appeals packet on *pro se* petitioner and file a declaration of service via ECF by July 26, 2013.

**SO ORDERED.**

Dated:   July 25, 2013
         Brooklyn, New York

                                        /s/
                                   **Kiyo A. Matsumoto**
                                   United States District Judge
                                   Eastern District of New York